MARGIE W. KENNEDY, Widow; ALMA SMALL KENNEDY HOMESLEY, Guardi-
an Ad Litem for ROGER DALE KENNEDY, Minor Child; LOLA HOLDEN
KENNEDY MILLER, Guardian Ad Litem for TRENTON ORGLEE KEN-
NEDY, Minor Child, of WILLIS TRENT KENNEDY, Deceased, Employee v.
MARTIN MARIETTA CHEMICALS, SODYECO DIVISION, Employer; CON-
TINENTAL NATIONAL AMERICAN INSURANCE CO. Carrier

No. 7626IC975

(Filed 5 October 1977)

1. **Master and Servant § 55.1 — workmen's compensation — accident defined**

    Within the scope of the Workmen's Compensation Act, the term "accident" has often been defined as (1) an unlooked for and untoward event which is not expected or designed by the injured employee; (2) a result produced by a fortuitous cause.

2. **Master and Servant § 67 — workmen's compensation — gas in work area — heart attack — cause of death**

    In an action to recover death benefits under the Workmen's Compensation Act for the death of an employee who died while welding in a large tank used for mixing chemicals, evidence was sufficient to support the finding by the Industrial Commission that there was some gaseous substance or some harmful agent which accumulated in the bottom of the tank and that this substance cut off decedent's oxygen supply, notwithstanding extensive evidence by defendants concerning the employer's precautions in preparing the tank for repair work, where such evidence consisted of testimony by one of decedent's co-workers that he went into the tank to help decedent, that there was "a heavy fume" or something which took his breath away, and that he lost consciousness and was sick as a result of breathing the fumes.

3. **Master and Servant § 67.3— workmen's compensation—cause of heart attack—finding supported by evidence**

> Testimony by a doctor in response to a properly worded hypothetical question was sufficient to support a finding by the Industrial Commission that a sudden deprivation of oxygen accelerated or aggravated decedent's pre-existing heart condition, thereby triggering a heart attack which resulted in his death.

APPEAL by defendants from final order of the Industrial Commission, entered 7 June 1976. Heard in the Court of Appeals 25 August 1977.

This is an action to recover death benefits under the Workmen's Compensation Act for the death of Willis Trent Kennedy. Deceased, an employee of the Sodyeco Division of Martin Marietta Chemicals, died while welding inside a thionator, a large tank used for mixing chemicals.

At the hearing before Deputy Commissioner Roney, plaintiff's evidence tended to show that on 3 January 1973, decedent, in good health, went into thionator six at defendant's Mount Holly dye plant to repair metal blades. After decedent had been inside the thionator for over an hour, he slumped over and began breathing heavily. He did not answer the calls of his helpers. One helper, Gary McCorkle, entered the thionator and attempted to rescue deceased. After being inside the thionator for about five minutes, McCorkle leaned down to extricate deceased's knee, and when his head was level with the head of the deceased, "a heavy fume . . . hit . . . [him], just like it took all . . . [his] wind away from . . . [him], made . . . [him] weak . . . ." McCorkle stated that he felt a smothering sensation and that he called out that there was gas inside the tank. He began to climb out of the thionator; the next thing he remembered was that he was lying on the ramp outside the thionator. He felt weak and dizzy, and he was sick for several days. Decedent was pulled from the thionator by another employee.

An autopsy of decedent revealed that he had died of a heart attack. Dr. Hobart Wood, an expert in the field of forensic pathology, who examined the cardiovascular system of decedent, testified that decedent had suffered a rather severe coronary heart disease with several years of plaque formation in the main coronary vessels. There was evidence of a previous heart attack. It was the opinion of Dr. Wood that "the heart attack [that caused decedent's death] could or might have been brought about by deprived or reduced oxygen supply."

Defendants offered evidence tending to show that thionator six had been shut down, emptied, and boiled clean with water and caustics before decedent entered the tank. The employees of Martin Marietta did not, at the time of decedent's death, smell any hydrogen sulfide, a poisonous gas and a by-product of the chemical reaction producing dye. After Kennedy's death, an employee of defendant chemical company tested the thionator for hydrogen sulfide and found none. He also examined various parts of the thionator and found no defects except a liquid line gate valve which was not properly seated in its recess. This liquid line connected the thionator to a condenser, and, according to the evidence, hydrogen sulfide could have backed up from the condenser through the defective gate valve into the thionator if there had been a malfunction in any of the other thionators connected to the condenser. There was no evidence of malfunction in the other thionators. Decedent had carried an air blower into the thionator, and at the top of the thionator there was an air jet continuously blowing air out of the thionator. According to defendants' evidence, the blower and the air jet, together, were sufficient to exchange all of the air in the thionator approximately once a minute.

Deputy Commissioner Roney found that decedent died as a result of a heart attack when his oxygen supply was suddenly cut off by hydrogen sulfide in the thionator. He concluded that this constituted an accident arising out of and in the course of employment, and he awarded death benefits to the plaintiffs. Defendants appealed to the Full Commission and it affirmed the award. The Full Commission, however, changed the Deputy Commissioner's findings and conclusions to eliminate reference to hydrogen sulfide as the cause of decedent's death. It found that decedent's oxygen supply had been cut off by a "gaseous substance, or some other harmful agent."

Defendants appeal.

*Delaney, Millette, DeArmon & McKnight, by Samuel M. Millette, for plaintiff appellee, Margie W. Kennedy.*

*Childers & Fowler, by Max L. Childers, for plaintiff appellees, minor children of Willis Trent Kennedy.*

*Kennedy, Covington, Lobdell & Hickman, by Edgar Love III, for defendant appellants.*

ARNOLD, Judge.

[1] Recovery under the Workmen's Compensation Act is designed to compensate for those injuries resulting from accidents which

arise out of and in the course of employment. The term "accident" has often been defined as "(1) an unlooked for and untoward event which is not expected or designed by the injured employee; (2) a result produced by a fortuitous cause." *Harding v. Thomas & Howard Co.*, 256 N.C. 427, 428, 124 S.E. 2d 109, 110-11 (1962). Injury by accident is an injury produced by a fortuitous cause. *Brown v. Aluminum Co.*, 224 N.C. 766, 32 S.E. 2d 320 (1944).

[2]   Defendants assign error to the finding by the Commission that there was some gaseous substance or some harmful agent which accumulated in the bottom of thionator six, and that this substance or agent cut off the decedent's oxygen supply. We must determine, then, if there is any evidence of substance which will directly, or by reasonable inference, tend to support the Commission's findings. If the findings of fact are supported by any such evidence they are binding on appeal even though there be evidence to support a contrary finding. *Willis v. Drapery Plant*, 29 N.C. App. 386, 224 S.E. 2d 287 (1976); *Russell v. Yarns, Inc.*, 18 N.C. App. 249, 196 S.E. 2d 571 (1973).

Gary McCorkle, the chemical company's employee who went into thionator 6 to retrieve the decedent, gave the following testimony:

> "I went down in the tank to see him sitting down on top of the coils. I called him. He still didn't answer. I grabbed him under each arm trying to pull him out. I couldn't budge him. As I looked down a little further in the tank, I noticed his leg was—it seemed to be stuck in between the coils or something, and as I stepped off the coil down into the bottom of the tank and as I leaned over to push his knee out, it was, I don't know, just a heavy fume or something hit me, just like it took all my wind away from me, made me weak, and I just hollered back up there and told them it was gas in the tank. I started crawling out. I think I remember getting to the mouth of the tank. I don't know whether I made it all the way out or somebody pulled me out. When I came to, I was out on the dock of the plant. I don't remember pulling myself out of the tank or nothing. All I remember when that heavy fume hit me it just made me dizzy and took the wind out. All I wanted to do was get some air."

Notwithstanding the extensive evidence by defendants concerning Martin Marietta's precautions in preparing thionator six for repair work, we find McCorkle's testimony to be competent evidence

which tends to support the finding that there was a harmful gaseous substance in the bottom of the thionator.

[3] The next argument presented by defendants is that the Commission erred in finding that a sudden deprivation of oxygen accelerated or aggravated Kennedy's pre-existing heart condition, thereby triggering his heart attack. According to defendants, Dr. Wood's testimony does not support that finding because (1) Dr. Wood's testimony on this point was in terms of possibilities rather than probabilities and (2) the hypothetical question directed to him did not contain all relevant facts. We disagree.

There is nothing in the record which indicates that Dr. Wood was testifying in terms of possibilities rather than probabilities. The hypothetical question posed covered two pages of the record and was propounded in the proper form, i.e., whether, in the opinion of the doctor, a particular event or condition *could* or *might* have produced the result in question. 1 Stansbury's N.C. Evidence § 137 (Brandis Rev. 1973). In *Lockwood v. McCaskill*, 262 N.C. 663, 668-69, 138 S.E. 2d 541, 545 (1964), cited by defendant appellant, Justice Moore stated that the

> " 'could' or 'might' as used by Stansbury refers to probability and not mere possibility. . . . A result in a particular case may stem from a number of causes. The expert may express the opinion that a particular cause 'could' or 'might' have produced the result—indicating that the result is capable of proceeding from the particular cause as a scientific fact . . . . If it is not reasonably probable, as a scientific fact, that a particular effect is capable of production by a given cause, *and the witness so indicates*, the evidence is not sufficient to establish *prima facie* the causal relationship . . . ." (Emphasis added)

Based on the foregoing standard, we find nothing prejudicially wrong with the doctor's opinion that the inhaling of hydrogen sulfide fumes or other irritating gases could have triggered the heart attack leading to the decedent's death. Furthermore, we reject defendants' contention that Dr. Wood's testimony was incompetent because the hypothetical question failed to incorporate the phrase "to a reasonable degree of medical certainty."

Defendants also argue that the hypothetical question was insufficient because it did not contain all relevant facts, namely that air was being introduced into the tank at various points, and that the blower was completely changing the air within the tank in a little over a minute's time. A close reading of the hypothetical question

reveals that the witness was not called upon to establish that there was a sufficient quantity of hydrogen sulfide to cut off decedent's oxygen supply; the rapidity with which the air was being replaced was not, therefore, a necessary element of the question to the expert witness. Consequently, we find no prejudicial error in the admission of Dr. Wood's answer to the hypothetical question.

In considering defendants' contention that the Commission erred in finding that a sudden deprivation of oxygen accelerated the heart condition, we have also reviewed the record to find whether or not there is any competent evidence to support the Commission's finding. In addition to the hypothetical question relating to the cause of the heart attack, there is evidence that the reddish color of the lungs of decedent could have resulted from inhalation of something other than oxygen. Evidence of the quick breathing by decedent also could have indicated a decreased supply of oxygen. Moreover, the doctor testified that decedent "[w]ith the degree of heart disease that he had ... would be in a certain precarious state if he were in a situation of decreased oxygen supply. It would certainly be, could be a stress situation for him, and it would lead to essentially a heart attack at some point because of this decreased oxygen with his impaired coronary circulation to the heart."

Based on the foregoing evidence, we conclude that the Commission, having found from competent evidence that there was a diminished oxygen supply due to the presence of a gaseous substance, could reasonably infer that the diminished oxygen supply, combined with decedent's arteriosclerotic heart disease, caused the fatal heart attack.

The order of the Commission awarding death benefits is

Affirmed.

Judges PARKER and MARTIN concur.